Good morning, Your Honors. May it please the Court, Stephen Hazel for the Federal Government. I have Yakov Roth with me at Council Table, and I'd like to reserve three minutes for rebuttal, if I can. Okay, just watch your time. To obtain continuation funding, a grantee must satisfy multiple requirements, including receiving a determination from the Department that continuing to fund a project serves the government's best interests. That requirement encompasses the full range of government interests, including its current policies. The District Court's injunction rests on an atextual reading of these regulations. It should be stayed in full. In the statute at issue here, Congress allocated funds for these programs without constraining how the Department distributes those funds, and the Department retained that discretion in these regulations. The continuation provisions specify that the Department must make an affirmative determination that five requirements are satisfying in order to distribute continuation funds. That includes requirements not just about performance and finance, but also about the government's best interests. And the text of that best interests provision is broad. It includes all government interests, not just the priorities set at the beginning of a grant contract, and it focuses on the time of the continuation decision, not some prior time inherent in determining the government's best interests. Excuse me, Your Honor. So, Counsel, I've got a couple of questions about that. The government's view of A-5 is, to say the least, very, very capacious. And I'm wondering why we have A-1 through A-4 if you have A-5. Your Honor, they're mutually reinforcing requirements. There may be cases where the government determines that a project is in the government's best interest. But why bother to set out other criteria if none of those things actually constrain you once you have A-5? A-5 is a catch-all that allows you to do whatever you darn well please. It's a darn well please clause. And that means that 1 through 4 are moot. You can satisfy 1 through 4 and have been scrupulous in everything, and 5 kicks you out for no reason that has been announced in advance, other than the government's whatever the government wishes to call it. And that doesn't seem consistent with the way that we usually treat these kinds of things, particularly when the government has announced in advance that it favors continuation and that that is the presumption. So, Your Honor, a couple of responses to that. First, this sort of broad catch-all is the norm in programs like this. So it's not just these department regulations. We've also pointed to separate regulations that govern most government grants. And those, again, give the government broad leeway to cancel or terminate discretionary grants when they're not serving an agency's priorities. The same is true, for example, in government procurement contracts. There's often this broad catch-all provisions that allow the government to end those sorts of contracts. And that's not a surprise given the statutory language here where Congress left it to the government to make these sorts of decisions. Your Honor, your question said this is the damn well please provision. I don't think I said it. I think I said the darn well please clause. Let's be very careful here. I want the record to be clear on that point. Of course, Your Honor. I think that's similar to what the Supreme Court said in Webster, which is that if simpler language exudes deference, even if the court isn't willing to say this is committed to agency discretion altogether, it's unsurprising that this language would be very broad. And I'll note that for plaintiff's part, they really don't have any response to the ordinary meaning of this text. They don't say that there's some other way of reading the government's best interests that wouldn't be very broad. This provision is A5 nevertheless subject to arbitrary and capricious review? Your Honor, as the court is aware, we've argued that this is committed to agency discretion. We appreciate this court at the state stage has rejected that argument. We're not focusing on it again here, although, of course, we may in our merits briefing in this case. Our point here is that when construed properly, this provision gives the government ample authority to discontinue contracts or grants based on its determination of the government's best interest. Okay, so I'm trying to figure out an answer to my question. So is it subject to arbitrary and capricious for purposes of today's argument? I understand you may wish to preserve a different argument for your merits briefing. Is it subject to arbitrary and capricious review? So, for example, if you said we're not going to continue because the majority of your administrators are black, that would or would not be subject to arbitrary and capricious review? Your Honor, for purposes of today's argument, we're not challenging this court's prior state determination that the government was unlikely to succeed on that argument. Again, I expect that we will take another shot at that at the merit stage, but that's not our point here. Our point is about the text. Plaintiff's argument focuses entirely on this separate subsection, subsection B. That's a procedural provision. It does nothing to limit the range of government interests that can be considered. Instead, it addresses the kinds of factual information and performance-related materials. Mr. Hizel, let me ask you. I have an interest in there's a statutory provision within GIPA that requires the department to promulgate through notice and comment rulemaking any generally applicable rule, regulation, guideline, or interpretation. And plaintiff's state's argument is that whether it's a directive or otherwise, that these discontinuation notices were driven by a generally applicable rule instead of new policies and criteria. Why hasn't the department run afoul of this statutory requirement to promulgate what its new priorities would be if that was going to be the basis for these discontinuation decisions? Your Honor, that statutory requirement is triggered when there's a generally applicable rule that has legal consequences. That's not the directive that plaintiff's referred to. That triggered an internal review within the department. It's not a generally applicable rule, and it's also not something with legal consequences. So it just doesn't fall within the scope of that statutory provision at all. The district court seemed to find otherwise. It said this was an across the board, across all types of grants, whether new grants or continuing grants or other grants that this review would have to be undertaken in view of the administration's new priorities, including for DEI. And isn't that finding subject to deferential review by our panel? In other words, I think what the district court found was that this directive did drive the consideration of what happened with the continuation notices. Your Honor, how to characterize the directive, whether it's final agency action, whether it comes within that notice and comment provision, that's a legal question that's reviewed de novo by this court. To the extent that the district court sought that notice and comment was required here was just wrong. There was notice and comment for this best interest provision that was done decades ago. The department can then apply this best interest provision in particular cases without again conducting notice and comment. And even if the court disagreed with us on that, that wouldn't justify the injunction here, as is true of all of plaintiff's procedural arguments. If there's a process concern, you at most get a process remedy, which would involve a remand from the district court to the agency to do whatever additional process would be required. That wouldn't justify an injunction requiring the department to make these decisions on an expedited timeline and to make them in accordance with the district court's extremely narrow understanding of this regulation and of the government's authority here. Let me continue to press you. The discontinuation notices were all stock language. They all had the same language, and it went out across to all 100 and I forgot how many there were grantees that are at issue here. Why weren't those notices the subject of a generally applicable policy or new criteria from the administration? Your Honor, of course, there was a new policy. The prior administration had very different views about DEI than this one. It's just that that new policy doesn't trigger the statutory notice and requirement because it wasn't the creation of a new regulation. Agencies change their policies all the time, and not all of those policies are embodied in generally applicable rules that have binding legal effect. To focus on the directive here, that was the initiation of an agency process of an internal review, but it wasn't the consummation of any process until it wasn't final agency action that would trigger that statutory provision. But again, if the court had concerns about that, that would in no way justify the injunction that's before you today. Well, I mean, as I understand it, the injunction is telling the department that you must go through the continuation decisions under currently applicable law and policy. And if you haven't promulgated these new priorities and they can't be a part of the consideration of the continuation awards, you've got to go based on existing policy that has been published and other performance criteria or related issues. Why is that improper in your view? So, Jonathan, the injunction goes beyond that and says that the department can only look at the very limited information that's described in subsection B. I don't know how that would be supported by this notice and comment argument. I'll also say that if the district court was concerned about this, it could vacate and remand these decisions to the agency to try it again to provide additional information, even to undergo notice and comment. We don't think that's appropriate here for the reasons that we've discussed. But if it did that, that would be a very different remedy than the sweeping injunction that the court has before it today. So you're saying that the district court could vacate and remand for notice and comment? Your Honor, we strongly disagree with the substance of that argument. My point is just that that is a narrower remedy than the injunction. I'm not sure I understand why that's narrower than what you've done. It seems to me that if you, acting under the district court's injunction, you could go back and change things by regulation. That seems to me that that does not, the district court's order doesn't exclude that at this point. Your Honor, that may well be true. The problem with that part of the order is it ignores the part of the regulations that is already there. The department doesn't need to undertake notice and comment to be allowed to consider the government's best interest because it already did that. There is already a best interest requirement. That's not just in the regulations. It's in the grant agreements. It's in even the guidance documents that Plaintiff's appointed. So, counsel, if DEI had been a part of the regulations here, would you be able to do what you did here? If a DEI component in your application and your eligibility for a continuing grant award had been incorporated into the Department of Education's regulations, would the department have been able to do exactly what it did here? Your Honor, I'm not entirely sure what it would mean to incorporate a DEI component into the department's regulations. Well, it might look very much like 20 U.S.C. 1228A. Your Honor, I disagree with that. That statutory provision is focused on saying that applicants need to describe what they're doing to promote equal opportunity. That doesn't at all prevent the department from having a view about what are good and bad ways to promote equal opportunity. And it doesn't prevent the department from taking those views into account in assessing the government's best interest. We've pointed, for example, to one of these grant applications that has what appears to be an express racial quota. There's nothing in that statutory provision that justifies that or that prevents the government from deciding that supporting such activities is not in its interest. Mr. Hazel, let me back you up a little bit. As I understood your argument, you're trying to equate the best interest provision in this set of regulations with the termination for convenience of the government in the procurement regulations. Is that correct? Your Honor, we're using them as an example of how government grant programs often work. And the key point is that these programs often make it very easy to cut off the flow of federal funds. And in the DOD context, under the federal acquisition regulations, there usually is a clause that permits the government to terminate the contract at its convenience. Is there not? That's right, Your Honor. And so this is a common feature of these sort of government programs. It's been a feature of this program for decades at this point. And plaintiffs shouldn't be surprised that it's there because they signed grant agreements that make clear we're only supporting you for the first year. You're not guaranteed to have any additional funding. And if you want additional funding, there needs to be this affirmative determination by the department. What is your best case for informing me as to what best interest mean under any prior iterations of A-5? Your Honor, I don't have a case that's interpreting best interest in the context of A-5 specifically. What I would point the court to is the Supreme Court's decision in Webster. That language is at a minimum very similar. The Supreme Court said exudes deference. I think inherent in assessing the government's interest is a consideration not just of the facts of a particular grant or project, but also considering the government's policies and making a judgment about the best way to advance those policies. And, again, plaintiffs haven't argued that that's not the plain meaning of this regulation. They haven't advanced some other way of understanding best interest. And their approach has this extraordinary consequence where a new administration would come in with its own policy views, and it would be tethered to the views of an old administration with which it vehemently disagrees. It would nonetheless need to go forward for years and making assessments of the government's best interest according to those views. Okay, but, counsel, isn't that a consequence of sort of the continuity in government? The idea that we announce to our citizens what the rules are, and we have to follow those rules. The new administration can change the rules, but it doesn't just get to do it by fear and doesn't just get to do it arbitrarily by announcement. When the rules have been reified, we've gone through notice and comment. You can change the rules in the same way in which they were made, but you don't get to just void them and walk away from them. Why hasn't that been a longstanding principle, and what are the reasons we have the APA? Your Honor, I don't disagree with any of that, except that this has been part of the regulations for 30 years. Going back to the first time there was this continuation regime, there has been a separate best interest provision that's been broad-language the whole time. There's no surprise here. It's been in the regs. It's been in the agreements. Plaintiffs could not have signed them. This is a discretionary grant program. It's not something that they're required to participate in. So this idea that there's something new or surprising here is just not worn out by the text of these regulations, which, again, plaintiffs have surprisingly looked to say about. Mr. Hagel, can I ask you about the equities? Why is there an emergency if the February 6th deadline was the one that the government itself had proposed after prior deadlines were either missed or couldn't be accomplished? Why is there an emergency basis here if it's the government's own deadline? Your Honor, it's not quite right to say that it's the government's own deadline. The government's position in district court in today is that there's no basis to set any deadline for these decisions. When the district court disagreed with that, we proposed February 6th as, at a minimum, that's a date by which it would be feasible for us to do that. But that wasn't in any way agreeing that it was appropriate to set deadlines for these decisions. And the fundamental problem with the injunction is that if the department is required to make these decisions using the very narrow construction adopted by the district court, then we expect it would have to distribute billions of taxpayer dollars to these plaintiffs. And these plaintiffs conspicuously have not said that they would return even a cent of that money to the government. But I mean, as I understand the government's argument, part of it is that you're under the gun, you're on a tight constraint, but it's a constraint of a deadline that you proposed. I mean, how much headway has the government made on these continuation decisions since the district court's preliminary injunction order in mid-December? Your Honor, I don't know the precise answer to that. What I can say is that the department was in the process of making these decisions when this court entered the partial administrative stay. Again, I just don't think it's right to say that we requested the February 6th deadline. We did it because the district court said, there's going to be a deadline, so you've got to give me a date. We don't think any date was appropriate. And if this court were not to state the injunction, just to be clear, millions of taxpayer dollars would need to go out the door to these plaintiffs who would not give them back, or do not promise to give them back. That should weigh very heavily on the scales with respect to irreparable harm. And with respect to plaintiffs' harms, I just want to emphasize two points with respect to their alleged harms. One is that they've known since April 2025 that the department planned to discontinue these grants. The department could have terminated them then and there in April, but instead it told them eight months in advance, this is what we're planning to do. So plaintiffs and the grantees have had ample time to adapt their projects to this department decision. The other part of this that I'd emphasize is that the department is not declining to spend federal funds. The department wants to spend these funds, it wants to get them in the hands of student mental health programs. It's held new grant contests, it's identified winners of those contests, it would like to distribute the full amount of funds to these winners. It's only that this litigation has prevented it from doing so. So this is a question of the department getting to decide where the funds go, not a situation where the department is saying we don't want to spend these funds at all. All right, well you've gone a little bit over, let me see if my colleagues have any other questions. Yeah, I do. I need to understand a little more about the status of the money. The last time your colleague was in front of us, the argument was that the funds had to be expended by the end of calendar year 2025 or else they would be lost. Or had to be, I guess, lapsed and sent back to the treasury. As I understand the district court's order, she enjoined the government from lapsing and returning that money. And then, in the meantime, Congress has enacted a budget for the Department of Education for fiscal year 2026. So do we now have two separate pots of money? Unspent money from the calendar year 2025 monies, and then new dollars from fiscal year 2026-2027? Your Honor, let me try to break it down. This is definitely complicated. The 2025 money, the department ended up using those funds to fund 2026 grants. So that was the way of making sure that the money didn't disappear at the end of 2025. So that's what happened with that. That money is all gone now? It's been obligated for 2026 grants. Did it go to the new awardees or did it go to the prior awardees? Your Honor, I believe it went to the new awardees. So it's been spent on 2026 projects. There are some circumstances where money can be deobligated. So there's some complexity there as well. Your question, Your Honor, and also asked about 2026 new appropriations. There have been some new appropriations to the department that are not earmarked for these programs specifically. They're the sort of lump sum appropriations in vigil where we strongly think those are committed to agency discretion as to how to use those funds. But there are some funds available there as well. And that money would be available to pay to the plaintiff states if they ultimately prevail on the merits. Is that correct? Your Honor, it depends. It depends on how long this appeal runs, the department and the department's priorities. So there is that discretionary fund now. There's obviously other things that the department could do with that money. I'll also note that separately in response to the district court's preliminary injunction, the department had set aside a little north of $60 million. That money is currently available as well. Again, depending on the course of events over the next few months and other priorities, that could change. But at least for now, there is some amount of money that could be available to plaintiffs. And again, on the other side, plaintiffs have a promise to return even if any does. Okay. I thought, Mr. Hazel, that part of the district court's preliminary injunction order was an order not permitting the government to repurpose the challenged funds to anyone else, to new awardees. But you seem to be describing that that money was repurposed to new grantees. Do I have that incorrect? I thought I read in the preliminary injunction order that that was one of the requirements. You're right. I haven't studied that part of the preliminary injunction order in a while. What I can tell you is that earlier this year in district court, the department filed a declaration. That's the Byrd Declaration that laid out sort of what is going on with each of these pools of money. And the district court sort of didn't have concerns at that time about sort of how this happened. Okay. Let me see if my colleagues have any other questions. We've taken you over, but we'll give you a little time for rebuttal. Thank you. May it please the court. I'm Ellen Range here on behalf of the plaintiff's states. This court should not grant a stay for three reasons. First, defendants violated the continuation regulation. Second, their actions were arbitrary and capricious many times over. And third, granting a stay would end plaintiff's projects and end mental health services for hundreds of thousands of kids during a national youth mental health crisis. How can you say that in light of what council just represented to us that monies have been allocated to new awardees? We have not received continuation funding, your honor. I know you haven't, but if they've awarded money to new awardees, aren't those services then being provided to the students by new awardees? No, that's not accurate, your honor, because they've only awarded about 65 new grants and they canceled over 200 grants. Just in the state of Washington, we had 11 grants and that dropped down to two. In the state of California, we went from 60 grants down to a handful of grants. So there is a dire need that is being unmet as it stands. So turning to the contrary to law, defendants' interpretation of the continuation regulation does not square with B's plain text in the regulatory framework because it allows them to end grants based on new priorities. Or as your honor, by B put it, as they darn well please. The text of B could not be more plain. It starts with information considered in making a continuation award and then cabins the A-5 best interest determination to using information regarding grantee performance. Defendants then elaborated that this category included performance reports, performance measures, and financial information. Therefore, in making the A-5 best interest determination, defendants may only consider information relevant to performance. Why can they only consider that? It says may and it doesn't say may only. I'm not sure why. I mean, it looks like that is the heart of what ought to be considered. But as I read A-5, I read it somehow differently than both the state and the government. The government wants to say it's a darn well please clause. You want to say, well, it's largely ineffective because it's cabined by B. And it seems to me that the reasonable position is that 5 is there in case there's something else that the government hasn't enumerated that comes up that demonstrates something else that's not articulable under 1 through 4. And that seems to me to be a perfectly reasonable reading of 5 and would not constrain B. Yes. So, Your Honor, may is construed as may only, particularly when it's followed by a list of items. And that is made clear in the chicken ranch case that we cited to in our briefing. I'd also be concerned, Your Honor, with the interpretation you just proffered, because it goes against the plain text of subsection B, where subsection B specifically calls out A-5 and says that the information that will be used when making the A-5 determination is performance and financial information. What does the interest clause do, counsel? Yes, Your Honor. What we have shown is that in subsection B, there is 2 CFR part 200 that is listed. And within that regulatory framework, there are requirements that grantees report significant developments under 2 CFR 200 329 subsection E, as well as things such as responding to audits. And that would give meaning to subsection A-5 in that it relates to issues concerning future performance, whereas A-1 through 4, it's entirely conceivable that you would have a grantee that was performing just fine, but because of a significant development, their future performance is in peril, such that A-5 is no longer in the best interest of the government. Whereas with defendant's interpretation, they don't even try to really give meaning to subsection B, whereas we've really endeavored to give meaning to each subsection of the continuation regulation. Is your position that they can't look beyond the performance requirements in 1 through 4 in order to determine whether continuation is in the best interest of the government? The district court seemed to think so in her injunction. So, no, Your Honor, what the district court held was that they couldn't consider new priorities and that they were restricted under subsection B to considering information that was similar to the items that were listed in subsection B. And in so doing, she was simply applying the adjust on generous rule where you're looking at the items that are listed and for any other relevant information, it has to be of a similar character to those items listed. So that's the rule that she applied to make that clear to enjoin from new priorities being considered. And it was also a consideration that the new priorities consideration of that would go against the regulatory framework because priorities are really just for selecting new grants. That's the purpose of them when they're discussed in the regulatory framework. That's how they're discussed. They're not meant to be used as a new measuring benchmark for grants that are already established. And, in fact, when you look at the regulations that are applied to performance measurement, such as that 2 CFR 200 301, it talks about how those performance measurements are set at the start of a project. Measurement includes implementing DEI priorities. Why can't the new administration come in and announce that it thinks there's a problem with that? Because the manner in which it has done is basically in violation of the civil rights laws or other general provisions saying that you can't discriminate by giving preferences to one race over another. So, in that scenario, would that be a best interest consideration as you understand the work of a five? No, Your Honor, because there's a separate statutory and regulatory framework that specifically applies to alleged civil rights violations that is mandatory for for defendants to comply with. And that is found at 42 USC 2000D-1 as well as 34 CFR 100.8. What those procedures afford certain safeguards for grantees that are, you know, where defendants are concerned that they're violating civil rights. And that includes defendants giving notice. They have to work with the grantees to try to get them into compliance. And it's only after there's a hearing where there's an express finding that they were not willing to comply with civil rights laws. Only then can they discontinue grants and that none of that was done here. Ms. Range, if what if the administration had promulgated new priorities through notice and comment rulemaking and said, you know, henceforth, we are going to look at these continuation decisions under this new criteria. Is it your view that under this regulation of 75.253B you couldn't look at that new criteria as a basis or could you then? Could not, Your Honor, because with new priorities, the issue with that is that you're interjecting instability into the continuation award process. And what is offered by the regulatory framework is assurances that what these grants are going to be judged on are performance measures that are set at the start of a project. So it doesn't matter that these priorities would have gone through notice and comment rulemaking because they're only supposed to be used in selecting new grants. So a new administration can make their mark as far as having new priorities, but they have to have them go through notice and comment rulemaking and then apply them to new grants, which is exactly what defendants did with the latest grant competition. I think what's working against that argument are a couple of things. One is you have a phrase like or any other reason and within be itself. And that would seem to lack any kind of a meaning because you've got the remaining listed factors already mentioned here that are performance related and adjacent. And you also have the fact that continuation awards are not guaranteed. It's a year by year analysis. Every year, the secretary can decide for the next year whether to continue it or not. So, I mean, I don't think that's the case before us, but I have a hard time seeing why a new administration couldn't publish new criteria to the public and then apply that general criteria and its continuation awards. Well, the issue with that, your honor, is that there is quite a bit of investment that goes into getting these grants up off the ground. And so if you have an administration or defendants who are allowed to come in and interject, it's like bringing a math test to a Spanish class, right? There's a fundamental unfairness when there is a new measuring stick that is being applied to grantees who are still serving the purpose of this program, right? They're still providing mental health services to school districts that are high need school districts. That purpose, that congressional purpose is still being served. It's just that new administrations, when they have new priorities or new policies, they do still have to follow the law. And under the continuation regulation, it limits the information that can be used to performance information or performance related information. And fundamentally, new priorities are not a measuring stick for performance. So let me ask you this. What the district court found that there was a violation of law also in not going through notice and comment rulemaking for these hidden new priorities. Do you know under that? And I was speaking with Mr. Hazel about this issue. Do you agree with that or no? Because it seems to me as if your argument is resting solely on a proper way to interpret 75.253 and not whether the department should have promulgated new rules. Yes, our primary argument is definitely the contrary to law subsection B. But it's a an add on that. In addition, not only did they violate subsection C, but they came along and use new priorities that weren't even published. So so there was a rule. If you go back to get them and how they define what a rule is, they were using new priorities as a rule that had legal consequences because they were using it. However, improperly, they were using it to discontinue grants. So your your position is that even if they had acted by rule, it would still violate C. It would violate subsection B as well as subsection C, your honor. And so the only way that the new rule would be effective is in at the end of five of a five year period. Well, the priorities are effective right away because they, for example, for any for any new for any for any bidding on on new projects, that might be true. But for people who have already gotten in the system, if I understand your argument, they've already made that investment. So your position is they can't change it by rule for those who already who already qualified for the first year. That's correct, your honor. And so in looking at subsection C, you know, it is clear we've just heard from defendants where they, you know, they were saying that they have this pot of money that's available and it depends on their priorities about whether the established grants or the new grants are going or the new grantees are going to get this money. But subsection C definitively says that it should not just be based on their priorities of the day, but rather there's this preset priority that that prioritizes established grants over new grants when defendants are making funding decisions. And essentially what that means is that defendants cannot kill off old grants to make way for the new, but that's exactly what defendants have done here. In our appendix at page 20 through 21, it shows defendants emailing Congress on the day that they discontinued these grants and they're telling Congress, we are getting rid of these grants because we want to make way for new grants. That is the blatant violation of subsection C. And so, yeah, I just don't see how they get around that. In looking at the arbitrary and capricious claims of defendants, defendants' directive procedure in implementing discontinuances and reconsideration denials were arbitrary and capricious in a myriad of ways, but I'd like to focus on just a few for today. First, they violated the change in position doctrine by not acknowledging or explaining their new anti-DEI policy, but instead they kept the grant priorities directive a secret because it would have exposed the safeguards that protect grantees throughout this process. And I've already described to your honors that the procedural safeguards that are found in the statutes and the regulations, and so that's concerning, right, that they have kept this policy. They had the February 5th policy in place, but they did not make that transparent to grantees. And had they made it transparent to grantees, well, then grantees would have been afforded notice that there's these procedural protections that apply even before defendants are discontinuing their grants that they've now circumvented. Ms. Range, was the problem with the notices that it just was a grab bag of different things and people had to guess at which one of these principles a particular grantee might have run afoul of, or was it more that this February directive wasn't disclosed earlier or made clear as to what the grantees should do in relation to that? I'd say both, Your Honor. They needed to be transparent about what this new policy was. They can't proceed by a subselectio policy, and that's what they've done. But also, in with the rationale that they articulated to the grantees, it was a grab bag. And it's clear from the record at Docket 80-3, you have a grantee reaching out to their federal officer, their grant officer, because they want to understand which of this grab bag of options apply to them so they can meaningfully engage in the reconsideration request process. And the federal grants officer has no additional information. They cannot identify which of those options actually apply to that grantee. So that's a problem. It's impermissible under SEC v. Chenery to make a grantee and now this court guess as to which rationale applies. Can I ask you, so in terms of where we are now in this posture, the February 6th deadline has passed. If we were to agree with you, would we send it back to the district court to set a new deadline? What would you suggest is the next step? We would ask that the court reset the compliance deadlines to be commensurate with where they were at the time of the administrative stay. So that at the time of the administrative stay, they have three business days to make that compliance decision. Then they had another three business days to issue any resulting awards. And then there was one more day for them to file a status report. So we would want those deadlines to be reset, Your Honor. From when? From the date of the order. From the date of our order or the date of the district court's order? The date of your order, Your Honor. But alternatively, you could remand to the district court for an appropriate order for the deadlines to be reset by the district court. So I do want to get to defendant's claim of irreparable injury because they are claiming, you know, millions of dollars that are going to have to be dispersed that they don't want to have to disperse. But there is a case that is directly on point, and that is the American Federation of Government Employees v. Trump. That's at 139F41020 at page 1030, where this court has held that it does not consider spending of funds already appropriated by Congress to be irreparable harm for a federal agency. So if that is the harm that defendants are claiming as a matter of law, it does not constitute irreparable harm in this court. On the other hand, plaintiffs would experience financial harm that we could never recover because this is an APA action. So this is unlike the NIH case that they like to cite to where the Supreme Court was directing the plaintiffs to go seek damages in the court of federal claims. We will never get those damages in a court of federal claims. So any financial harm that we're suffering is harm that we're going to have to take on the chin. So if the court has to choose between financial harm, it should be choosing the states who were the clear winners of this litigation and have no hope of recovery for financial harm, whereas defendants are dispersing funds that have already been appropriated by Congress. Given the clear and unrebutted evidence of irreparable harm that plaintiffs provided to support the injunction and the minimal to no irreparable harm faced by defendants, this court should find that the equities tip sharply in plaintiffs' favor. Unless this court has further questions, I'll conclude. No other questions. Thank you, Ms. Range. Mr. Hazel, we'll give you a couple minutes for rebuttal. Your Honor, three quick points on the construction of this regulation. Plaintiffs' arguments today make clear that, in their view, A5 doesn't mean anything. As I understand it, they think that anything that serves the broad purposes of this program should be continued for the full term. Congress could have done that. The Department could have created a program like that. That's not what the Department did. Their only textual hook, as they made clear again today, is subsection B. That's an anodyne provision that addresses what performance information the Department typically considers. There's similar provisions in many regulations. They've never been understood. Counsel, I'd like to take you to B just a little bit. So there's three things there that are listed. This includes considering, and then there's three things. The first one, the report's required by 75118. That reflects A2. Performance measures established under 75113. That's A4. So these are described in the prior rule. And then the last one is the financial information required by 2 CFR Part 200. The particular provision of Part 200, these are general regulations. These are administrative regulations, not program regulations. So they're not specific to this program. Are you with me? I am, Your Honor. These are general administrative regulations applicable to all DO-ED programs. And I am in particular concerned with 75.210D. Because that is the quality of project services and is apparently the DEI requirement. And it does cite in that regulation 20 U.S.C. 1228A. So it looks to me like DO-ED has got a general overlay requiring these parties to report in something dealing with involvement with the justice system, pregnancy, parenting, caregiver status, sexual orientational, national origin, and so on and so on and so on. And it looks to me like the plaintiffs did that here. And now they've been punished for that for reasons that are not entirely articulated in the record. Now, why doesn't DO-ED have to behave by regulation? Why doesn't that make this arbitrary and capricious when you've put this into your regulations? Your Honor, there's lots of ways to show that you're doing something about equal opportunity. Some of those ways might involve something like an express racial quota. Just because you have to say something about what you're doing doesn't mean all those ways are right. And just to make a broader point about these sorts of procedural arguments, including this argument that the department had to say more about these regulations, including the argument that some sort of notice and comment needed to happen. We disagree with those arguments. But if that was the court's concern, the remedy was not this injunction. It would be an opportunity for the department to do whatever process was required. If the court understands A5 more narrowly than we do, but not to mean nothing, as the plaintiffs suggest, then the department should have an opportunity to take another shot at this. If the court thinks that there needed to be notice and comment, again, we strongly disagree with that, given that the best interest regulation has been part of this for years. But if that's what the court was concerned about, the department should have an opportunity. I think this is a little bit of a double-edged sword for you. Because one thing that you've said is, look, the plaintiffs have known since last April they've had lots of time to make adjustments here. But it also feels like that applies to the Department of Education. You were on notice that there might be some problems here. And the whole notice that you gave can go one of two ways, neither of which I think favors the department. Either you've denied these folks due process because you've given them such an indistinct explanation that they cannot understand even how to file an appeal. Or you have behaved in a regulatory way with an across-the-rule, same notice to hundreds of applicants. And you've provided a rule outside of the strictures of the APA. It seems that either way, it looks to me like the Department of Education is end-played. So I'd love to hear your explanation. And now you want another shot at the whole thing, a year later. So, Your Honor, a couple of responses to that. One, it's not surprising that there would be a common explanation for a common problem. If the court thinks there needs to be more explanation here, then the court and the district court could send this back to the agency and it would be happy to add. Okay, so what is the explanation? What's the problem? Your Honor, the problem, which is clear from the record and from the real world, is that the department opposes DEI. It has a very different view. How did it manifest itself in any particular case here? Because everybody had to comply with the DEI under the prior administration. But you didn't disapprove all of the grants. Yet everybody had to do that or they wouldn't have been approved under the prior regs. So now we're really left wondering who got in and who wasn't in. So, Your Honor, that's not correct about the prior regs. So the prior regs had some absolute priorities and then some competitive priorities. The competitive ones give you sort of additional points, but they weren't an absolute requirement. And so not all of these projects did have DEI features that the department was concerned about. And for the grantees who weren't sure what the concern was, they had an opportunity to request reconsideration. Many did. They received individualized responses. I saw the individualized responses. It had a good deal more detail than the notice did. Do they now get another chance to contest that? Can they request reconsideration of the denial of the reconsideration now that they've got an explanation for the first time? Your Honor, to the extent that a particular grantee is dissatisfied with their reconsideration request, they could litigate that. That obviously wouldn't justify an injunction covering more than 100 grantees in this case. If I could make one last point, Your Honors, I know we're over time at this point. My friend on the other side pointed to this AFL decision addressing irreparable harm. The Supreme Court has now, in multiple cases, disagreed with that decision and made clear that as in a case like this one, where federal taxpayer dollars would need to go out the door and that there's not an obvious way of getting them back and plaintiffs aren't suggesting that they would give them back, that is certainly irreparable. Thank you. Any last questions from my colleagues? No. Great. Thank you, Ms. Hazel, and I thank both of the parties. The matter will stand submitted and court is adjourned for the day.
judges: TALLMAN, BYBEE, SANCHEZ